Professor John C. **BONNELL** and Nancy L. Bonnell, Plaintiffs,

v.

Albert **LORENZO**, Individually and in his Representative Capacity as President of Macomb Community College; William MacQueen, Individually and in his Representative Capacity as Vice President for Human Resources of Macomb Community College; Gus J. Demas, Individually and in his Representative Capacity as Dean of Arts and Sciences for Macomb Community College; and Mark Cousens, Individually and in his Representative Capacity as the Attorney for the Macomb Community College Faculty Organization, Defendants.

Civil Action No. 99–71155.

United States District Court, E.D. Michigan, Southern Division.

Aug. 27, 1999.

Juan A. Mateo and James C. Howarth, Detroit, MI, for Plaintiffs.

Thomas P. Brady, Detroit, MI, Timothy S. Ferrand, Pontiac, MI, for Defendants.

*ORDER AND OPINION GRANTING PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION*

BORMAN, District Judge.

Before the Court is Plaintiff John C. Bonnell's Emergency Renewed Motion for Preliminary Injunction. The Court heard oral argument on this motion on July 15 and 30, and August 3 and 19, 1999. Upon consideration of the motion, the submissions of the parties, and the applicable law, the Court GRANTS Plaintiff's motion and ORDERS his immediate reinstatement with pay as a Professor of English at Macomb Community College.

## I.  INTRODUCTION

Although the instant complaint is based in part on discipline received for using allegedly profane classroom language, the Court's resolution of the instant motion, as discussed *infra*, does not reach the issue of First Amendment protection of the specific profane speech used by Plaintiff in his classroom.

The issue presently before this Court is whether, given the instant fact scenario, Plaintiff, who was already been suspended from teaching for seven months, can be suspended for an additional four months based upon the Defendants' determination that he violated the confidentiality of a student complainant, and retaliated against that student who had filed a complaint against him based upon his use of profane language in the classroom. Specifically, the issue is whether Plaintiff's conduct in releasing the student's complaint, after removing the student's name and class, and attaching an eight page memorandum discussing the First Amendment in responding to the complaint, was protected by the First Amendment to the Constitution, or was instead a violation of confidentiality and an act of retaliation against the student.

This Court concludes that Plaintiff's conduct in releasing a redacted copy of the

complaint, attached to his response entitled *An Apology: Yes, Virginia, There is a Sanity Clause*, was protected by the First Amendment and was not a breach of confidentiality or retaliation against the student complainant.

## II. BACKGROUND

### A. Underlying Factual Development

Plaintiff[1] Professor John C. Bonnell filed the instant action alleging, *inter alia*, that disciplinary action imposed against him violates his civil rights. The lawsuit names as defendants in their individual and representative capacities Albert Lorenzo, President of Macomb Community College (MCC); William MacQueen, Vice President for Human Resources of MCC; Gus J. Demas, Dean of Arts and Sciences for MCC; and Mark Cousens, the attorney for the faculty union, the Macomb Community College Faculty Organization (MCCFO).[2] Neither MCC nor MCCFO are named as defendants.

Bonnell has been a professor of English and literature at MCC since 1967. Bonnell asserts that throughout the decades he has employed "all of the English language" in his teaching style, including words which some may regard as offensive. Until the events giving rise to the instant action, Bonnell has never been disciplined for his use of classroom language.

The genesis of this matter arises from a complaint filed against Bonnell by a student of his in the fall 1998 semester. The student asserted that Bonnell's profane language in the classroom, while not directed at any student, amounted to sexual harassment. Defendants ultimately determined that while colorable, the complaint lacked merit as to the sexual harassment claim. However, MCC suspended Bonnell for three days in February 1999 due to his allegedly profane classroom language. Thereafter, Bonnell responded to the student's complaint by redacting her name and class and distributing it along with his response, *An Apology: Yes, Virginia, There is a Sanity Clause*. MCC reacted to Bonnell's response by suspending him for four months without pay, primarily for breach of confidentiality and for retaliation against the student complainant.

MCC had established a sexual harassment policy in September 1992 which also enveloped the use of non-germane, profane language in the classroom. The policy stated, *inter alia*, that

> the [MCC] administration concluded that academic freedom does not protect acts of sexual harassment or the use of profane, vulgar, or obscene language which is unrelated to the course content and educational purpose.

(Sexual Harassment Memorandum, Sept. 15, 1992; MCC Defendants' Response, OMPI,[3] Ex. 1.) It also warned that

> the College will discipline teachers who sexually harass their students or gratuitously and regularly use profane, vulgar, or obscene language in the classroom.

(*Id.*) The Court notes that the policy and the memorandum deal with two separate issues -- first, sexual harassment, and second, the use of non-germane, profane language.

The Court recognizes that there is a significant difference, constitutionally, between the First Amendment protections afforded to an individual regarding use of classroom language, and use of language to retaliate against a student. Nerverthe-

---

1. Although both Professor John C. Bonnell and his wife Nancy L. Bonnell jointly filed the instant action, the term "Plaintiff" refers to Professor Bonnell.

2. "MCC Defendants" collectively refers to Defendants Lorenzo, MacQueen, and Demas.

3. As the emergency renewed motion for preliminary injunction incorporates the original motion for preliminary injunction, this Order necessarily cites to both sets of briefs and exhibits. Accordingly, the citation "OMPI" refers to the original motion for preliminary injunction, and "RMPI" refers to the renewed motion for preliminary injunction.

less, because Bonnell's classroom language was the basis for the student's complaint, it is important to note that there is no evidence that Bonnell's use of profane language in the classroom was ever directed toward a particular student.

MCC's sexual harassment policy was revised in February 1996 and May 1997. Defendant MacQueen, MCC's Vice President for Human Resources, issued a memorandum on July 30, 1997 which he distributed with the policy and which stated:

> Regular use of profane, vulgar or obscene speech in the classroom which is not germane to course content (and thus educational purpose) as measured by professional standards will lead to the imposition of discipline.

(MCC Defendants' Response, OMPI, Ex. 3.)

On January 19, 1998, a parent of a Bonnell student (not the student complainant in this matter) complained to MCC about a handout Bonnell distributed in class. (See Letter by Keith Waller, Jan. 19, 1998; MCC Defendants' Response, OMPI, Ex. 4.) The handout, titled My Semester Overview, was prepared in 1991 by one of Bonnell's former students and reviewed Bonnell's course. The review is generally favorable, except for the professor's use of profanity. (See My Semester Overview, MCC Defendants' Response, OMPI, Ex. 4.) Bonnell contends that he distributes this handout to his students at the beginning of each semester in order place them on notice of the type of language he employs in teaching the English course.

Based on the January 19, 1998 complaint from the parent, MacQueen initiated an investigation. MacQueen wrote Bonnell a memo on February 19, 1998 regarding "Obscene and vulgar language in classroom," and scheduled a meeting with Bonnell and his union representative on February 26, 1998. (See MCC Defendants' Response, OMPI, Ex. 5.) In a memorandum dated February 23, 1998, Bonnell agreed to the meeting and defended the language he used. (See MCC Defendants' Response, OMPI, Ex. 6.)

Bonnell explained that he never directed any vulgar terms toward a particular student, and that he only used the words to demonstrate an academic point. With regard to the terms in My Semester Overview, Bonnell contended that he rarely used words like "pussy" or "cunt" as they are so emotionally charged. Bonnell maintained that he employed these terms to demonstrate "the chauvinistic, degrading attitudes in society that depicts women as sexual objects, as compared with certain words used to describe male genitalia which are not taboo or considered to be deliberately intended to degrade." (Plaintiff's Brief, OMPI, at 3.)

The February 1998 investigation concluded with MacQueen issuing Bonnell a warning letter on March 4, 1998. The letter advised Bonnell that:

> Unless germane to a discussion of appropriate course materials and thus a constitutionally protected act of academic freedom, your utterance in the classroom of such words as 'fuck,' 'cunt,' and 'pussy' may serve as a reasonable basis for concluding as a matter of law that you are fostering a learning environment hostile to women, a form of sexual harassment.

(Memorandum Regarding Obscene and Vulgar Speech, March 4, 1998; Plaintiff's Brief, OMPI, Ex. C.)

During the 1998 fall semester, a second complaint was filed against Bonnell, which became the catalyst for the action at bar. On November 6, 1996, a female student enrolled in Bonnell's English 122 course telephoned MCC to complain about his classroom language. An, as yet, unidentified MCC employee instructed her to reduce her complaint to writing. She, thereafter, filed a written complaint which, in four places, termed her complaint about language as relating to sexual harassment. MCC, thereafter, treated it as a sexual harassment complaint. The written complaint alleged that, in discussing sexually

charged literature, Bonnell used "lude [sic] and obscene comments ... [which] were dehumanizing, degrading, and sexually explicit." (Sexual Harassment Complaint, Nov. 6, 1998; (Attachment 1) MCC Defendants' Brief, OMPI, Ex. 8.) Based on this charge, Defendant Demas, MCC's Dean of Arts and Sciences, instituted an investigation of Bonnell on November 16, 1998. Demas provided Bonnell a copy of the complaint and informed him that a meeting was scheduled to discuss it, and that he was entitled to have union representation present.

Prior to the next meeting, Bonnell, after redacting both the complaining student's name[4] and the class in which she was enrolled from the sexual harassment complaint, distributed copies of it to the students in all six of his classes and posted it on a bulletin board outside of his class. Bonnell maintains that he did this in order to inspire a class discussion on academic freedom and to solicit student feedback. He indicated that he was under the impression that the complainant had withdrawn from the class, but that if she had been present, he would not have distributed the redacted copies. (*See* Transcript of Motion Hearing, Bonnell Testimony, August 3, 1999 at 68-71.)

Defendant William MacQueen, Defendant Gus Demas, two representatives from the Macomb Community College Faculty Organization (MCCFO), Defendant Mark Cousens, MCC's general counsel, Bonnell, and others, met on December 3, 1998 to discuss the sexual harassment complaint. MacQueen informed Bonnell that the complainant orally relayed her concerns of

Bonnell's use of the phrases "blow job" and "butt-fucking" in his class. Bonnell admitted to using the terms, but contends that he explained the context for this use, and that the terms were germane to course content. The MCC Defendants assert that, while Bonnell did indicate that "blow job" was used in reference to the President Clinton/Monica Lewinsky affair, he did not state that the language was germane to his classes or was connected to an attempt to discuss issues of public concern.

On December 12, 1998, in response to the instant student complaint and the ongoing investigation by MCC, Bonnell wrote an acerbic satire entitled *"An Apology: Yes, Virginia There is A Sanity Clause,"*[5] (hereinafter the *"Yes, Virginia"* memorandum). Among other topics, the *Yes, Virginia* memorandum responds to the specific issues of Bonnell's classroom language which the complainant relayed to MCC. Bonnell concluded his *Yes, Virginia* memorandum by stating that his use of the terms at issue was protected by the "sanity clause," *i.e.*, the First Amendment. (*See* Plaintiff's Brief, OMPI, Ex. D.) Bonnell attached the *Yes, Virginia* memorandum to a redacted copy of the sexual harassment complaint, and distributed copies of both to more than two hundred MCC faculty members.

A second MCC hearing on the sexual harassment complaint was conducted on December 18, 1998. Prior to the hearing, MCC had determined that there was no legally justifiable basis for the student's sexual harassment complaint against Bonnell. Ms. Margaret MacTavish, MCC's Di-

---

**4.** Hereinafter, the terms "complainant" or "complaining student" refer to the student who filed the instant complaint against Bonnell on November 6, 1998.

**5.** Bonnell based his *An Apology: Yes, Virginia, there is a Sanity Clause* memorandum on the famous editorial *"Yes, Virginia, there is a Santa Claus,"* first published in the NEW YORK SUN on September 21, 1897. *See A Special Anniversary Issue of the London Free Press*, LONDON (Ontario, Canada) FREE PRESS,

Feb. 25, 1999, at E1. Francis P. Chuch wrote the editorial in response to eight year old Virginia O'Hanlon's letter questioning the existence of Santa Claus. Virginia's letter and Church's response are widely known as a number of newspapers have reprinted them each Christmas for over one hundred years. *See, e.g.*, THE BUFFALO NEWS, Dec. 25, 1998, at B2; THE DETROIT NEWS, Dec. 25, 1998, at F5.

rector of Human Resources Management and Affirmative Action Officer, testified that "[t]he decision that was made was to pursue the complaint on the basis of the profane, vulgar, obscene language in the classroom rather than sexual harassment." (MacTavish Dep. at 135; Plaintiff's Memorandum of Law Pursuant to the Court's Directive on July, 16, 19[9]9, Ex. A.) Furthermore, at that hearing, Cousens, in the presence of MCC officials, informed Bonnell that sexual harassment was no longer the issue. Indeed, MacTavish testified that before the officials met with Professor Bonnell, it was determined that the agenda for that December 18 meeting was not sexual harassment, but the use of words. (*Id.* at 136.)

MCC then proceeded, during that hearing, to concentrate on the issue of Bonnell's classroom language. At the hearing, the statements of some of Bonnell's students were taken. Of the five students present, only one student indicated a problem with Bonnell's language.

On January 5, 1999, Demas issued a memorandum, prepared by MacQueen,[6] which suspended Bonnell without pay from February 1-3, 1999. Demas/MacQueen concluded that Bonnell improperly used in his class the terms "shit," "damn," "fuck," "ass," "butt-fucking," "blow job," and "tits on a nun are as useful as balls on a priest." (*See* Plaintiff's Brief, OMPI, Ex. E.) Thus, to summarize the chain of events, MCC at this time had determined that the student complaint was not a valid claim of sexual harassment, and further, had disciplined Bonnell for his classroom language with a three day suspension. In response to his three day suspension, Bonnell drafted a scathing memorandum to Demas, and, like the redacted complaint and the *Yes, Virginia* memorandum, he distributed it to the MCC faculty. (*See* MCC Defendant's Brief, OMPI, Ex. 13.)

On January 8, 1999, MacQueen issued a memorandum to Bonnell stating that Bonnell's distribution of his *Yes, Virginia* memorandum with the sexual harassment complaint may deter students from complaining. Accordingly, MacQueen instructed Bonnell:

> not to post, distribute, or discuss ... specific complaints filed by one or more of your students against you regarding sex harassment or your use of obscene or vulgar language, or such complaints against you generally, with any person enrolled in one or more of your classes unless permission has been granted by [MCC Provost] Dr. Rose Bellanca upon application of your union or attorney. *This prohibition extends to discussion of any disciplinary action which has or may be taken against you.*

(Memorandum Regarding Discussion of Student Complaints, Jan. 8, 1999; MCC Defendants' Brief, OMPI, Ex. 14) (emphasis added). MCC describes this memo as a "privacy directive," while Bonnell refers to it as a "gag order." This directive prevented a college English professor from informing his adult students that he was being suspended from teaching for three days. Were the students supposed to assume when he did not appear that Professor Bonnell was "skipping" class, shirking his responsibility as a professor? It was an important part of his responsibility to his adult students to explain why he would not be teaching his classes. This was a draconian restriction on a professor's ability to properly communicate with his students.

The MCC Defendants contend that Bonnell violated this January 8, 199 directive and conducted a public retaliation campaign. During the latter half of January 1999, Bonnell, *inter alia,* distributed copies of the *Yes, Virginia* memorandum attached to the redacted student complaint to television channels 4 and 50, and to THE MACOMB DAILY newspaper. In addition,

---

6. In addition to being Vice President of Human Relations for MCC, Defendant Mac-
Queen is also a labor law attorney.

Bonnell violated the order by informing his classes that, due to his suspension, he would not be present to teach between February 1-3, 1999. Bonnell did not go into greater detail about his absence.

On January 28, 1999, Bonnell met with MacQueen and others to discuss the circumstances surrounding the distribution of the *Yes, Virginia* memorandum and the redacted complaint.

On February 1, 1999, during the first day of his suspension, nearly all of Bonnell's students were absent from his classes. Instead, they signed attendance sheets indicating that they were supporting Bonnell and protesting his suspension. In addition, some students demonstrated against Bonnell's suspension on the MCC campus.

On February 2, 1999 MacQueen placed Bonnell on an indefinite suspension, with pay and benefits, pending an investigation.[7] That suspension, which lasted until July 9, 1999, prevented Bonnell from teaching in the spring and summer terms.

MacQueen based the indefinite February suspension on (1) abnormally low attendance for the substitute teacher in Bonnell's classes; (2) the substitute teacher overheard a student stating that Bonnell told them they did not have to attend class, (3) MCC's discovery that Bonnell would allegedly mark down the grades of students who did attend class during his three day suspension; (4) disruptive protests by seven to nine of Bonnell's students; (5) Bonnell's alleged delivery of the confidential sexual harassment complaint to the news media in violation of both MacQueen's earlier directive and federal law;[8] (6) Bonnell's alleged wasting of class time in order to prepare for a television news interview; and (7) Bonnell's discus-

sion of his suspension with the media. MacQueen informed Bonnell that

Because each of the foregoing matters is or may be causally related to disruption of the educational process (or even physical confrontation) in your classes or in other classes at Macomb, and requires investigation by the College which may lead to further disciplinary action, *you are hereby suspended from your duties as a teacher with pay and benefits, effective February 4, 1999.* This suspension will continue until you are notified by me in writing that you may resume your duties. *During this suspension, you are hereby directed not to enter any campus of Macomb Community College except for the limited purpose of meeting with MCCFO leaders or College officials relative to disciplinary action which has been or may be taken against you. You are also hereby directed not to discuss this suspension or any disciplinary action (verbally or in writing; directly or through a person acting in your direction) with any person enrolled as a student at Macomb or any person intent on disrupting the educational process at Macomb,* unless written permission is granted by Dr. Rose Bellanca for good cause upon application of your union or attorney.

(Memorandum Regarding Suspension, Feb. 2, 1999; Plaintiff's Brief, OMPI, Ex. F) (emphasis added). The Court notes the draconian nature of this suspension: (1) Bonnell could not enter any MCC campus except to meet with college or union officials; (2) Bonnell was also significantly restricted with regard to whom he could discuss his suspension.

MacQueen's speech restrictions on Bonnell were a prior restraint, since Bonnell must request permission before being al-

---

7. On July 9, 1999 MCC Provost Rose Bellanca, *inter alia,* suspended Bonnell for four months without pay, from August to late December 1999. This is discussed, *infra.*

8. The MCC Defendants informed Bonnell that his delivery of the student's complaint to the

news media violates, *inter alia,* the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g. (*See* Memorandum Regarding Suspension, Feb. 2, 1999; Plaintiff's Brief, OMPI, Ex. F.)

lowed to speak to his students (or the media). *See Lovell v. City of Griffin,* 303 U.S. 444, 451–52, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Because prior restraints severely impact First Amendment rights,

> "'[a]ny system of prior restraints of expression comes to [the court] bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *see also Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971)." *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (Pentagon Papers) (per curiam).

*Moore v. Kilgore,* 877 F.2d 364, 387 (5th Cir. 1989) (dissenting opinion). The MCC Defendants have not demonstrated a compelling interest in restricting Bonnell's speech nor that the prior restraint is the least drastic means of doing so.

Bonnell asserts that, through the collective bargaining process, he has sought protection from MCCFO's attorney, Defendant Mark Cousens, as early as March 1998. Bonnell contends that Cousens indicated that neither he nor the union supported Bonnell's interest. As a result, Bonnell retained private counsel. Bonnell

9. Bonnell's next disciplinary hearing was originally scheduled for March 11, 1999. However, along with the instant complaint, Bonnell filed a motion for preliminary injunction or temporary restraining order on March 10, 1999. Accordingly, the MCC Defendants adjourned that hearing upon learning through Bonnell's new counsel that he would not attend this meeting.

10. On April 26, 1999 Plaintiffs filed a motion to file a First Amended Complaint. The amended complaint contains adds one count: (VII) Pendant State Law Claim: Breach of Contract Against Defendant Board of Trustees of the Community College District of the County of Macomb.

sought to have his new counsel represent him at the next stage of disciplinary hearings set for March 1999.[9]

Based on the disciplinary action taken against him as of March 1999, and the continuing speech restrictions the MCC Defendants had placed on him, Bonnell filed the instant complaint on March 10, 1999. Bonnell and his wife allege six counts in their Complaint: (I) Conspiracy to Violate Civil Rights of Professor Bonnell, 42 U.S.C. §§ 1983, 1985; (II) Constitutional Substantive Violations; (III) Gross Negligence, 42 U.S.C. §§ 1983, 1985, 1988; (IV) Declaratory Judgment; (V) Negligence/Duty of Fair Representation under Michigan law; and (VI) Loss of Consortium.[10]

## B. Subsequent Factual Development and Procedural Posture

On March 10, 1999, along with his Complaint, Bonnell filed a motion for preliminary injunction or in the alternative for temporary restraining order. On May 6, 1999, the Court heard oral argument on this motion. Ruling from the bench, the Court denied the motion for that time, to permit the parties to proceed with a hearing at MCC because, in an unprecedented action, rather than requiring that Bonnell be represented by union counsel at the hearing, Defendants Lorenzo, MacQueen, and Demas, and the MCCFO agreed to permit Bonnell to be represented by his own counsel at the hearing.[11]

11. Aside from the action taken by MCC, Jim Yizze, president of the MCCFO, issued a memorandum to all Union members on May 10, 1999. In addition to providing a summary of Bonnell's case to date, the Yizze memorandum stated the Union is not required to support all grievances, but instead is only obligated to objectively consider the merits of each case presented to the Faculty Senate. Yizze concluded that Bonnell does not have the right to replace MCCFO representatives unilaterally, but he does have the right to waive MCCFO representation and pursue his cause through alternative means. (*See* Memorandum Regarding John Bonnell Suspension— Update, May 10, 1999; Plaintiff's Brief, RMPI, Ex. D.)

The disciplinary hearing was held on May 25, 1999 at MCC. In attendance were Professor and Mrs. Bonnell and their counsel; Defendant MacQueen and his counsel; Defendant Cousens representing the MCCFO; William Romano, Assistant Grievance Coordinator for MCCFO; Marie Baeckeroot, Grievance Coordinator for MCCFO; Margaret MacTavish, Director of Human Resources of MCC; and Dr. Rose Bellanca, Provost of MCC. (*See* Transcript of Bonnell Grievance Hearing, May 25, 1999; Plaintiff's Brief, RMPI, Ex. A.) The hearing consisted of Bonnell being questioned on several issues by his attorneys and MacQueen. Bonnell denied encouraging his students to be absent on February 1, 1999 while he served his three day suspension. (*See id.* at 5-6.) Although admitted that he discussed his suspension after students questioned him, he denied that he commented on the specific details of the sexual harassment complaint against him, other than to explain that a student complained about his language. (*See id.* at 6-7.) Bonnell admitted that he provided the television and print media a packet containing a redacted copy of the complaint, which omitted identifying characteristics of the student, and a copy of his satirical *Yes, Virginia* memorandum. (*See id.* at 7-9.) While he denied that he distributed copies of these material to his current students, he admitted that he gave a packet to a former student who later enrolled in the literature class he was teaching. (*See id.* at 7-10.)

During the May 25, 1999 hearing, Bonnell maintained that he believed that his teaching methods complied with MCC's July 30, 1997 memorandum prohibiting regular use of profane, vulgar, or obscene language not germane to course content. (*See id.* at 12-13.) In addition, he submitted as evidence roughly twenty-five unsolicited letters of support from his students. These letters detail Bonnell's teaching methods, the events occurring during the week of his three day suspension, and why the students did not attend class. (*See* Plaintiff's Brief, RMPI, Ex. B.) Specifically, one letter from Sherry Davis explains that she voluntarily organized the boycott of Bonnell's class in protest of his suspension. (*See id.*)

Finally, Bonnell detailed the attendance policy for his classes. Bonnell explained that he gives no credit for attendance when students attend a class. If they attend while he is absent, or if they attend a class preceding or following a class for which he announced that he would be absent, Bonnell gives his students a modicum, 1/64th, of credit. Put another way, Bonnell compensates students who attend class when he does not. Bonnell stated that this policy may have led to confusion during his suspension. (*See* May 25, 1999 Transcript at 23-25, Plaintiff's Brief, RMPI, Ex. A.)

On June 7, 1999, MacQueen sent Bonnell a memorandum stating that, based on the January 28 and May 25, 1999 investigative hearings, "there is reasonable cause to believe that [Bonnell] violated Federal and Michigan law." (Memorandum Regarding Notice of Charges, June 7, 1999; Plaintiff's Brief, RMPI, Ex. C.) In this memo, MacQueen formally notified Bonnell of four charges that MCC was initiating against him: (1) Insubordination by distributing copies of the student's sexual harassment complaint and by discussing his discipline with students, both in violation of MacQueen's January 8, 1999 directive; (2) Breach of Confidentiality by distributing copies of the student's complaint and the satirical *Yes, Virginia* memorandum to the faculty, media, and a former student in violation of both the collective bargaining agreement between MCC and MCCFO and the Federal Family Educational and Privacy Rights Act (FERPA); (3) Retaliation against the complainant student by distributing the student's complaint in violation of MCC's policy prohibiting sexual harassment, federal Title IX, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA); and (4) Disruption of the Educational Process by materially contributing

to the absences of nearly all of his students in his classes and distributing the student's complaint. The memo concluded:

> Since a finding that you committed any of the violations alleged above (including disruption of the educational process) may lead to the imposition of discipline, you are entitled to a hearing before Dr. Rose Bellanca at which you, your attorneys, and/or MCCFO may present evidence or argument in opposition to a conclusion that you committed them or that disciplinary action should be taken. Please have your attorneys or MCCFO representatives inform [MCC's attorney] by June 18, 1999 whether you wish a hearing. If a hearing is not requested, Dr. Bellanca will proceed to a determination of these charges.

(*Id.* at 4.) On June 22, 1999 Plaintiff declined a hearing before Dr. Bellanca.

On July 9, 1999, MCC Provost Dr. Rose Bellanca issued a "Disciplinary Suspension Memorandum" to Professor Bonnell. Although the memorandum of findings was drafted by MacQueen,[12] it was based on Dr. Bellanca's own conclusions regarding each of MacQueen's four charges.

Dr. Bellanca first determined that Bonnell disrupted the educational process when he informed his students about his suspension, the "gag order," that their attendance during this period was their choice, that they would receive credit for signing an "attendance sheet," and when Bonnell distributed the sexual harassment complaint to the media. As a penalty for "Disruption of the Educational Process," Dr. Bellanca imposed a formal reprimand. The Court concludes that the January 8, 1999 MacQueen directive prohibiting Bonnell from discussing his suspension with his students amounted to a gag order. Indeed, that "gag order" amounted to a disruption of the educational process.

With respect to the charge of "Insubordination," Dr. Bellanca concluded that Bonnell should be disciplined for violating MacQueen's January 8, 1999 memo, and for distributing the student's complaint to the media. As to this charge, Dr. Bellanca imposed an unpaid two week suspension. "Insubordination" is a strange term to use against an English professor under a continuing contract. The MCC Defendants use of the term "insubordination" against Professor Bonnell ties in with the Defendants' argument that "All he has is a right to industrial due process, as it were, industrial relations due process ...." (Motion hearing, July 30, 1999, Transcript at 37.) The Court recognizes that colleges are a resource for ideas, free thought, experimentation, and critical thinking. The position of a college English professor includes with it First Amendment protections that may not be present in the military service[13] or in an industrial job. The teaching of college English requires the communication of thoughts and ideas by reading and writing, and the use of the entire English language. When a college gags the professor or censors the students, the free expression of ideas and thoughts as supported by the First Amendment is impinged upon. There is no valid justification in support MCC's suspension of Bonnell for insubordination for 14 days without pay, from August 18, 1999 to August 31, 1999.

Finally, Dr. Bellanca concluded that Bonnell was responsible for breach of con-

---

12. *See supra,* n. 6.

13. The U.S. Court of Appeal for the Third Circuit noted in *Trotman v. Bd. of Trustees of Lincoln University,* 635 F.2d 216, 230 (3d Cir. 1980):

> It is particularly important that in cases dealing with academia, the standard applied in evaluating the employer's justification should be the one applicable to the rights of teachers and students "in light of the special characteristics of the school environment," and not that applicable to military personnel who must meet the "overriding demands of discipline and duty."

(quoting *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)).

fidentiality and retaliation for distributing redacted copies of the sexual harassment complaint and his *Yes, Virginia* response. As to this charge, she imposed an unpaid four month suspension from August to September 1999 that would continue throughout the Fall 1999 semester.[14] This suspension will be fully discussed, *infra.*

Currently before the Court is Plaintiff's Renewed Motion for Preliminary Injunction. Plaintiff seeks an order reinstating him with pay as a Professor of English at MCC, pending a full hearing on the merits of his claim in this court.

### III. EXHAUSTION OF REMEDIES

Appendix D of the Agreement between the Board of Trustees of the Community College District of the County of Macomb and the MCCFO (the Agreement) establishes a three step grievance procedure for MCC teachers and the MCCFO to pursue in the event of a dispute over the Agreement. (*See* Plaintiffs' Complaint, Ex. A.) Accordingly, the MCC Defendants argue that the case before the Court is actually an untimely labor dispute as opposed to an action for First Amendment violations. The MCC Defendants contend that Bonnell is suspended pursuant to the Bellanca Memorandum. The MCC Defendants also maintain that the collective bargaining agreement requires Bonnell to resolve this dispute through the grievance/arbitration procedures prior to taking the matter to court, and, therefore, the court should dismiss the case for being untimely. Bonnell contends that the suspension was based on his exercise of his First Amendment rights relating to free speech.

■ Generally, an employee may not pursue a civil action against his employer for breach of a collective bargaining agreement unless he has exhausted the grievance procedures set forth in the contract. *See Rogers v. Board of Educ. of Buena Vista Schools,* 2 F.3d 163, 166 (6th Cir. 1993); *Sankar v. Detroit Board of Education,* 160 Mich. App. 470, 474, 409 N.W.2d 213 (1986). Courts have, however, granted exceptions to this rule in situations such as where a plaintiff seeks remedies not provided under the collective bargaining agreement, or where a plaintiff's efforts to exhaust contractual remedies would be futile. *See Sankar, id.*

■ In the spirit of the first exception, an employee is not always required to exhaust remedies provided in a collective bargaining agreement when the employee challenges violations of rights independent of the contract, such as statutory claims. *See, e.g., Wright v. Universal Maritime Service,* 525 U.S. 70, 119 S. Ct. 391, 396– 97, 142 L.Ed.2d 361 (1998) (absent a clear and unmistakable waiver of the right to sue, longshoremen did not have to exhaust arbitration clause of collective bargaining agreement before filing claim under Americans with Disabilities Act). The same exception would apply in the case of challenging violation of constitutional rights.

■ Bonnell has alleged that, in violation of 42 U.S.C. § 1983, Defendants infringed upon his First Amendment rights. The Supreme Court has held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In the context of § 1983 actions filed by teachers

---

**14.** Bonnell has requested his union, MCCFO, to file a grievance on his behalf concerning these disciplinary sanctions. On two recent prior occasions, the MCCFO Faculty Senate, by wide margins, voted not to proceed with grievances requested by Bonnell. If the MCCFO votes to file the grievance, Bonnell will be suspended from teaching with pay while the matter is being resolved. If MCCFO refuses to support the grievance, then Bonnell will receive no pay. Further, even if MCCFO supports the grievance, if Bonnell loses the grievance decision, he will be suspended without pay for four months. During the grievance process, Bonnell will be suspended from teaching for the four months of August to December, 1999, pursuant to the Bellanca memorandum of July 9, 1999.

for First Amendment violations, courts have relied on *Patsy* to hold that professors do not need to exhaust either state administrative remedies or remedies provided by collective bargaining agreements prior to their cases being heard in federal courts. For example, in *Narumanchi v. Board of Trustees of the Connecticut State University*, 850 F.2d 70 (2d Cir. 1988), a university professor filed suit after he was suspended without pay for two weeks, allegedly based on his race and vocal opposition to various university policies. The district court dismissed his First Amendment claims after the professor refused to avail himself of the grievance procedures in the collective bargaining agreement. In reversing the district court, the Second Circuit held that:

> [First Amendment rights] may not be infringed regardless of the procedural "protection" accompanying the deprivation.... [It is not] permissible, in light of *Patsy v. Board of Regents, supra*, to require initial recourse to available state proceedings, *including union grievance proceedings*, for the enforcement of First Amendment rights protectable in federal court pursuant to section 1983. *See Clark v. Yosemite Community College District*, 785 F.2d 781, 790 (9th Cir. 1986); *Hochman v. Board of Education*, 534 F.2d 1094 (3d Cir. 1976).

*Narumanchi*, 850 F.2d at 73 (emphasis added). *See also Mellody v. Upper Merion Area School District*, No. CIV. A. 97-5408, 1998 WL 54383, *4 (E.D. Pa. Jan. 30, 1998); *Mahoney v. Hankin*, 593 F. Supp. 1171, 1173–74 (S.D.N.Y. 1984). Accordingly, Bonnell is not required to exhaust his administrative remedies prior to filing his § 1983 action.

## IV. PRELIMINARY INJUNCTION

Bonnell moves for a preliminary injunction to require the MCC Defendants to reinstate him to his position as an English professor at MCC. In the original motion for preliminary injunction, Bonnell requested an order permitting his private counsel to represent him during any disciplinary proceeding. In light of the Court's May 6, 1999 ruling, this issue is now moot.

■ In evaluating a motion for preliminary injunction, the Court considers four factors: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. *See Amelkin v. McClure*, 168 F.3d 893, 902 (6th Cir. 1999) (quotation marks and citation omitted). The Court will examine these factors in a slightly modified sequence.

### A. Irreparable Harm

From the events giving rise to the instant action, MCC has issued Bonnell a number of disciplines and/or restrictions. Prior to Dr. Bellanca's suspension memorandum of July 9, 1999, Bonnell had received a three day suspension from February 1-3, 1999 for use of non-germane, profane classroom language; a privacy directive; and then on February 2, 1999 an indefinite suspension for "investigation" which concluded on July 9, 1999.

In July 1999, after reviewing the "charges" issued against Bonnell in June 1999, Dr. Bellanca imposed three sanctions: a formal reprimand, an unpaid two week suspension from mid-August to late August 1999, and an unpaid four month suspension during the fall 1999 semester from mid-August to mid-December, 1999. Of these disciplinary actions, a portion of the two week suspension, and the unpaid four month suspension have yet to be served.

The MCC Defendants contend that while Plaintiff may have a MCCFO contractual right to receive his salary during the resolution of his grievance, he does not have a constitutional right to work. Conse-

quently, they maintain, Plaintiff has not demonstrated the requisite irreparable harm necessary for a preliminary injunction *if* MCCFO votes to proceed with his grievance.

Two principal issues are before the Court:

I. Was Plaintiff was suspended for exercising his First Amendment rights when he distributed to faculty, students, and the media copies of his *Yes, Virginia* memorandum and a redacted version of the student's sexual harassment complaint?

II. Assuming, arguendo, that Plaintiff was suspended for exercising First Amendment rights, does he have a constitutional right to teach while he attempts to grieve his suspension through the contractual arbitration process?

Since a determination that Plaintiff has not suffered irreparable injury would preclude further analysis of his motion for preliminary injunction, the Court will examine the irreparable harm issue first, *i.e.,* the second of the above listed issues

█ Sixth Circuit authority is clear that a nontenured teacher does not have a constitutional right to teach a particular class. *See Parate v. Isibor,* 868 F.2d 821, 832 (6th Cir. 1989) (citing *Sullivan v. Brown,* 544 F.2d 279 (6th Cir. 1976)). In *Parate,* a nontenured engineering professor filed a section 1983 action and moved for a preliminary injunction to reinstate him after university officials terminated him at the end of his contract. Parate asserted separate claims under both the First Amend-

ment and the Fourteenth Amendment. Without regard to the First Amendment claim and solely related to Plaintiff's "Fourteenth Amendment claim that the [university officials] arbitrarily and unreasonably interfered with his due process liberty interest in the free and full pursuit of his profession as a ... professor," the court held that Parate had no Fourteenth Amendment right to teach at that university nor a constitutional right to teach a specific class. *Id.* at 831–32. In the instant case, however, Bonnell is a professor under continuing contract at MCC and indeed has been teaching there for 32 years. Thus, he has a right to continued employment at MCC.

█ While a professor has no liberty interest to teach a specific class or teach at a particular university, a professor *does* have a constitutional right to teach in an environment free from First Amendment violations. In *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), an untenured school teacher was not rehired after, *inter alia,* he called a local radio station to publicly criticize the administration for a new dress code for teachers, and after he used obscene gestures toward students in the cafeteria. In examining Doyle's claim that he was not rehired due to his First Amendment activities,[15] the Court held that

Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and he had no constitutional right to a hear-

---

**15.** In *Mt. Healthy,* the district court found that the telephone call was "clearly protected by the First Amendment" and that because it played a "substantial part" in the district's decision not to rehire Doyle.. The Sixth Circuit affirmed, and the Supreme Court vacated and remanded. The Supreme Court held that the district court used the wrong test to analyze Doyle's claims. The Court explained that after he satisfied his burden of showing that his conduct was constitutionally protected and was a motivating factor in the board of education's decision not to rehire him, the

district court should have gone on to determine whether the board of education had shown by a preponderance of the evidence that it would have reached the same decision even in absence of the protected conduct. The Supreme Court accepted the district court's determination that the phone call was constitutionally protected in part because there was no suggestion by the Board that Doyle violated any established policy. *See Mt. Healthy,* 429 U.S. at 284, 97 S.Ct. 568. In the instant case, MCC had a policy of confidentiality with regard to sexual harassment complaints.

ing prior to the decision not to rehire him, *he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.*

*Mt. Healthy,* 429 U.S. at 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (emphasis added).

Although Bonnell does not have a liberty interest in his teaching position, if he was suspended for First Amendment activities then he has established irreparable harm. This conclusion is also supported by *Newsom v. Norris,* 888 F.2d 371 (6th Cir. 1989).

In *Newsom,* prison inmate advisors sought a preliminary injunction to be reinstated after they were not reappointed, allegedly in retaliation for criticizing the performance of the Chairman of the Disciplinary Board. The inmate advisors claimed, *inter alia,* that the failure of the warden to reappoint them to their positions violated their First Amendment rights. Like *Parate,* the Sixth Circuit determined that the inmate advisors did not have any liberty interests in their positions. However, the Sixth Circuit held:

> Although the appellees did not demonstrate a cognizable property interest in their position as inmate advisors, they did however have a cognizable liberty interest in remaining in their respective positions free from impermissible interference. *It is well recognized that it is constitutionally impermissible to terminate even a unilateral expectation of a property interest in a manner which violates rights of expression protected by the First Amendment.*

*Newsom,* 888 F.2d at 375 (emphasis added) (citing, *inter alia, Mt. Healthy,* 429 U.S. at 283–84, 97 S.Ct. 568).

The Sixth Circuit further supported its decision with Supreme Court authority relating to the situation at bar, *i.e.* rights of teachers to teach:

> Existing [Supreme Court] case precedent indicates that a failure to reappoint an individual to a position is equally impermissible, even where there was no cognizable expectation of continued service, if reappointment was denied because of the individual's exercise of First Amendment rights.
>
> Thus, the respondent's lack of a contractual or tenure "right" to reemployment for the 1969-70 academic year is immaterial to his free speech claim. Indeed, twice before, *this Court has specifically held that the nonrenewal of a non-tenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights. Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). We reaffirm those holdings here.

*Newsom,* 888 F.2d at 376 (emphasis added) (quoting *Branti v. Finkel,* 445 U.S. 507, 515, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)) (also citing, *inter alia, Mt. Healthy*).

Also based on Supreme Court authority, the *Newsom* court determined that even minor infringements of First Amendment rights constitute the irreparable harm necessary for injunctive relief as "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Newsom,* 888 F.2d at 378 (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion of Brennan, J.)).

Therefore, in the case at bar, Bonnell will suffer irreparable injury if he was suspended for engaging in protected First Amendment activities.

### B. Likelihood of Success on the Merits

Bonnell filed a 42 U.S.C. § 1983 action against the defendants.[16] The ele-

---

16. 42 U.S.C. § 1983 provides:

Every person who, under color of any stat-

ments for a § 1983 claim are: "'1) [Plaintiff] was deprived of a right secured by the federal Constitution or laws of the United States; 2) the deprivation was caused by a person acting under color of state law; and 3) the deprivation occurred without due process of the law.'" *Chatman v. Slagle,* 107 F.3d 380, 384 (6th Cir. 1997) (quoting *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 995 (6th Cir.1994)) (alterations supplied).

In the case at bar, the MCC Defendants are employed by a state institution and are acting under state law. *See, e.g., Silva v. University of New Hampshire,* 888 F. Supp. 293, 312 (D.N.H. 1994).[17]

Bonnell's current four month suspension is ostensibly based on, *inter alia,* distributing his *Yes, Virginia* memorandum with the redacted sexual harassment complaint to the MCC faculty, other students, and the public at large. MCC contends that these actions breached the confidentiality for the complainant provided in Section I.A. and Section II of MCC's Policy Prohibiting Sexual Harassment; Article VIII. A.7 of the Master Agreement between MCC and the MCCFO; the Family Educational and Privacy Rights Act (FERPA), 20 U.S.C. §1232g; Title IX of the Educational Amendments to the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq.;* and the Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS ANN. § 37.2101, *et seq.* MCC also asserts that Bonnell's actions could be regarded as retaliation against the complainant as set forth in the Bellanca memorandum:

> The distribution of your memorandum titled *An Apology: Yes, Virginia, There is a Sanity Clause* was designed to dis-

credit [the complainant] as an immature young woman in need of enlightenment, and thus was designed to destroy her credibility as a complainant. Most significantly, your memorandum is thoroughly demeaning and insulting to [the complainant] as a person in both its content and its tone. It is the very antithesis of how a teacher should treat a student and how a complainant would expect to be treated given the assurances of the law and College policy.

(July 9, 1999 Memorandum from Dr. Rose Bellanca to John Bonnell, regarding Disciplinary Suspension, at 6.)

Professor Bonnell asserts that the First Amendment protects the distribution of the *Yes, Virginia* memorandum, as it relates to academic free speech. In addition, Bonnell maintains that his current suspension is a pretext: that MCC is disciplining him for his classroom language. Essentially, Plaintiff contends that not only was his classroom language the basis for his three day suspension, but that MCC's "privacy directive"/"gag order" was a continuation of MCC discipline, and finally, that the suspension for breach of confidentiality/retaliation was further discipline for his challenging MCC's actions regarding his exercise of his First Amendment rights. The issue at bar has developed into whether the First Amendment protects Plaintiff's distribution of the redacted sexual harassment complaint and the *Yes, Virginia* memorandum.

The Supreme Court has held that government employees, including public teachers, retain First Amendment rights to comment on matters of public concern without fear of retribution by the govern-

---

ute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

17. Although not relevant to the motion at bar, Bonnell alleges in his Complaint that Defendant Cousens' conduct is also under "state law" since he allegedly conspired with the MCC Defendants. *See Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

ment as their employer. *See Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Dambrot v. Central Michigan University,* 55 F.3d 1177, 1185 (6th Cir. 1995). In *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Court developed a balancing test which weighed "the interests of the [public employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

In *Pickering,* the Supreme Court was confronted with a situation where the school district dismissed a high school teacher "for sending a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools." *Pickering,* 391 U.S. at 564, 88 S.Ct. 1731. The Supreme Court held that the issue of school funding was a matter of legitimate public concern, and that free open debate on that subject matter was vital to informed. decision making by the electorate. In the instant case, Plaintiff contends that free speech in a classroom, and responding to persons challenging free speech in a classroom, is a matter of legitimate public concern. Furthermore, in *Pickering* the Supreme Court stated:

> Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 572, 88 S.Ct. 1731. In the instant case, Plaintiff contends that he, as an English teacher, is a person most likely to speak out and have an informed and definite opinion with regard to germane speech in the classroom, and that accordingly, it is essential that he be able to

speak out on an issue without a retaliatory dismissal. The Court agrees.

Further, Plaintiff contends that since MCC had concluded that the student's complaint, which discussed Plaintiff's classroom language and sexual harassment, clearly did not raise an issue of sexual harassment, the remaining aspect of the complaint was language in the classroom. Thus, Plaintiff contends that his *Yes, Virginia* memorandum dealing the "Sanity Clause," clearly dealt with the First Amendment classroom speech issue. Plaintiff further contends that he used the redacted student complaint, which had caused his February 1-3, 1999 suspension, as a context for him to respond both to her challenge to his classroom language, and MCC's gag order that sought to prevent him from discussing these First Amendment issues, even with his college students.

The Supreme Court in *Pickering* concluded:

> the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

*Id.* at 573, 88 S.Ct. 1731. In the instant case, MCC cannot limit Plaintiff's opportunity to contribute to the public debate on what is germane language in the classroom of a professor of the English language.

The Supreme Court in *Pickering* emphasized the "public interest in having free and unhindered debate on matters of public importance--the core value of the Free Speech Clause of the First Amendment." *Id.* at 573, 88 S.Ct. 1731. The Supreme Court held that:

> a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.

*Id.* at 574, 88 S.Ct. 1731. In the instant case, MCC cannot suspend Bonnell from teaching because of his speaking out on

First Amendment issues. Plaintiff has spoken on an issue of public importance that deserves the court's protection.

The Court recognizes an issue raised in *Pickering,* and discussed by the Supreme Court thereafter in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684 (1983), that must be discussed. In *Pickering,* the Supreme Court noted that under those facts, the fact of plaintiff's employment was only tangentially and insubstantially involved in the subject matter of his public communication, so as to regard the teacher as a member of the general public. In the instant case, the MCC Defendants contend that under *Connick v. Myers,* Plaintiff is directly involved through his employment position with the issue at bar, and thus is not protected under the First Amendment.

In *Connick,* the Supreme Court noted:

> For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.

*Connick,* 461 U.S. at 142, 103 S.Ct. 1684. The Supreme Court held in *Connick:*

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684.

In *Connick,* the Supreme Court incorporated the *Pickering* balancing test into a two step analysis for determining whether discipline against a public employee violates the First Amendment. The primary concern is whether the speech at issue may be "fairly characterized as constituting speech on a matter of public concern." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684; *see also Dambrot,* 55 F.3d at 1186. If the speech relates to a matter of public concern, the court moves to the second step of the analysis and applies the *Pickering* balance test; "[i]f the employee's free speech interests outweigh the efficiency interests of the government as employer, the employee's First Amendment rights have been violated." *Dambrot, id.*

#### 1.  *Public Concern*

■ The issue of whether speech relates to public concern is a question of law. *See Dambrot, id.* In *Connick,* the Supreme Court explained that "public concern relate[es] to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.[18] The Seventh Circuit has elaborated that by "public concern," the *Connick* Court "did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat." *Dishnow v. School Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir. 1996) (citations omitted) (emphasis added). *Connick* instructs that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684.

In the case at bar the issue is whether, based on the content, form, and context of the *Yes, Virginia* memorandum and redacted sexual harassment complaint, Bon-

---

**18.** In *Connick,* a former assistant district attorney asserted that her First Amendment rights were violated when she was allegedly terminated for circulating a questionnaire relating to her superior's decision to transfer her to a different section of criminal court. The Supreme Court held that although one of the questions, relating to whether employees felt pressure to work in political campaigns, was a matter of public concern, that the interests of her employer in effectively and efficiently fulfilling his public duties outweighed any harm to the Plaintiff.

nell's speech related to a matter of public concern.

The content and form of Bonnell's speech specifically relate both to the sexual harassment complaint and to the First Amendment free speech clause. Further, it is important to note that the sexual harassment complaint had already been resolved in Bonnell's favor at the time of his *Yes, Virginia* memorandum. This supports the conclusion that he *Yes, Virginia* memorandum was what its title and conclusion asserted it to be—a discussion of First Amendment issues, in the context of classroom language.

Professor Bonnell testified that he distributed the complaint in class in order to inspire a debate on academic freedom under the First Amendment, that he distributed the complaint and the *Yes, Virginia* memorandum in order to specifically give context to the discussion:

Q. Sir, you indicated that you wanted to discuss the concepts of academic freedom and First Amendment by distributing [the redacted complaint]?

A. Yes.

Q. You could discuss in your class academic freedom and [sic] context of First Amendment without any complaints being filed against you?

A. Probably could have.

Q. You could have had a similar discussion without distributing [the sexual harassment] complaint?

A. I couldn't have that discussion. I needed that document to give it the specific context to the discussion.

Q. The context of the discussion was her particular complaint against you for language and sexual harassment. That was the context of the discussion with your students. That's what you just said?

A. No. What I'm saying, the thing that triggered the First Amendment concern happened to be couched in that letter. It came in the form of that letter.

Q. But to have that discussion with your class, you didn't need to distribute her specific complaints?

A. That's true.

Q. In terms of actual distribution and discussion with the students the context was the complaint that she filed against you, is that correct?

A. That was triggered, yes.

Q. Wasn't that the context of it? That's what brought the issue to context?

A. That is not the only the [sic] thing that we talked about. The academic field is broader than that complaints [sic].

Q. It may be, but you specifically discussed her complaint, correct?

A. It was specifically used as a trigger for discussion in --

Q. Sir, did you discuss her complaint?

A. Not in particular detail.

Q. Why did you distribute it to the students?

A. Because it was a document. True, they didn't need to know, but it was [sic] document that was pertinent.

Q. And it was pertinent that she made a complaint against you?

A. It was pertinent because it existed, and thee was a complaint against me evidently because of that document.

Q. That's what made it relevant because she filed a complaint against you?

A. Yes.

Q. With respect to the Yes, Virginia document, you testified that your distribution of Yes, Virginia, together with a copy of the [sexual harassment] complaint, you also distributed, correct?

A. That's right.

Q. And again, you said that you distributed that with respect to general issues of academic freedom and freedom of speech?

A. Yes.

Q. You could have that discussion, that academic discussion concerning First Amendment and academic freedom, with

your faculty cohorts without using that document, correct?

A. Probably so, yes.

Q. That document gave it contexts [sic] to you that this was dealing with a specific complaint by a specific student against your conduct, correct?

A. And with the addition that the college was acting on it, so that if a similar complaint came against any teacher at any time, the person could respond.

Q. That was not the question. You discussed or attempted in your own words to discuss those concepts with your faculty fellows by distributing the student complaint and the Yes, Virginia letter.

A. Yes.

(Transcript of Motion Hearing, Bonnell Testimony, August 3, 1999 at 68-71.)

While Bonnell acknowledged that he could have had a discussion of academic freedom without distributing the redacted complaint to his classes, it was the context of the complaint that made his discussion significant and relevant, not only in class, but also with the faculty and the media.

In *Cliff v. Bd. of School Commissioners of the City of Indianapolis,* 42 F.3d 403 (7th Cir. 1994), the plaintiff was a public school teacher who alleged that school board violated her First Amendment rights by not renewing her contract after she complained about her large class size and problems with student discipline. The court held that although her complaints addressed a subject of general interest to the public, her First Amendment claim failed as a matter of law since her expression was directed only to the personal impact of those issues on her. *See id.* at 409. The Seventh Circuit explained the analysis to determine whether these complaints were a matter of public concern:

Connick requires that we consider *"the content, form, and context"* of Cliff's statements as revealed by the record as a whole (461 U.S. at 147–48, 103 S.Ct. at 1690–91), and our cases indicate that of these three, *content is the most impor-*

*tant. The motive which underlies an employee's statements is a relevant but not necessarily dispositive factor.* A number of our cases thus direct attention to *"'the point of the speech in question; was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'"* Yet we also have indicated that motive cannot rise to the level of an absolute litmus test because it does not supplant content in terms of overall importance to the public concern inquiry. Thus, *the fact that an employee speaks at least in part for personal reasons will not automatically deprive her statements of the protections afforded to speech on a matter of public concern.* Instead, the speaker's personal motive is considered along with the other *Connick* factors.

*Cliff,* 42 F.3d at 409–10 (citations omitted) (emphasis added). This rationale was adopted by the Sixth Circuit. *See Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564, 576 (6th Cir. 1997). Thus the issue here is whether Bonnell's discussion/distribution relating to the personal complaint amounted to speech on a matter of public concern.

In *Cliff,* the plaintiff argued that her statements about class size and disciplinary problems were matters of public concern. However, the court recognized that although the community would no doubt be interested in these issues, "the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [her] remarks on the subject protected." *Id.* at 410 (citation and quotation marks omitted). Additionally, the court noted that Cliff only complained in response to criticism directed at her classroom performance in her annual reviews.

The entire eight page *Yes, Virginia* memorandum does not state that the student had filed a sexual harassment complaint against Bonnell, or· even use the

term sexual harassment. It is totally directed toward a discussion of the English language.

This indicates that Bonnell's motive in writing the *Yes, Virginia* memorandum was not to retaliate for a sexual harassment complaint, but instead to discuss First Amendment concerns in the context of classroom language.

In the instant case, the issue relating to speech in class transcends the more personal, individual matters of class size and discipline in *Cliff.* These are matters of significant public First Amendment concerns.

### 2. Pickering Balance Test

The First Amendment provides teachers, especially professors, academic freedom which "emphasizes the essentiality of free public expression of ideas." *Dambrot,* 55 F.3d at 1189. In *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675 , 17 L.Ed.2d 629(1967), the Supreme Court elaborated:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'

(citation omitted).

Bonnell has substantial protectable interests because his speech related to matters of public concern. Yet, the Court recognizes that the First Amendment does not provide him with *carte blanche* authority to trump the interests of his students to be free from retaliation for filing sexual harassment complaints. However, given this balancing test, it is important to note that the MCC Defendants ruled that the sexual harassment complaint, which related to classroom language not directed to any particular person, was without merit.

The complaint procedure of MCC's Sexual Harassment policy specifies:

> To protect the interests of the complainant, the alleged sexual harasser, witnesses, any others who may report incidents of sexual harassment, and all other persons affected, confidentiality will be maintained to the extent practicable and appropriate under the circumstances.

(Sexual Harassment Policy, Rev. May 20, 1997, § II at 2; MCC Defendants' Response, RMPI, Ex. 14.) This is in line with the MCC and MCCFO agreement stating that "[c]are must be taken to preserve confidentiality during the entire process [of handling students' complaints of faculty.]" (Agreement, Art. VIII.A.7, Complaint Ex. A.) In addition, the policy prohibits retaliation:

> Macomb Community College shall assure that no individual shall be retaliated against for making a complaint of sexual harassment, opposing sexual harassment, or participating in an investigation under this policy, regardless of whether a policy violation is found.

(Sexual Harassment Policy, § III.D. at 4.)

Webster's dictionary defines "confidential" as "Communicated or effected secretly." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 297 (1988). Bonnell redacted the complainant's name and class. This maintained the confidentiality of the complainant. Thus, Bonnell's concern was to deal with the language contained in the complaint and not the specific complainant. Indeed, it was the MCC Defendants who subsequently released the complainant's name to the public, with her permission.

The law is unsettled as to whether the release of a redacted complaint would be a violation of the FERPA. *Compare Warner v. St. Bernard Parish School Board,* No. CIV.A. 96-1839, 1998 WL 50016 (E.D. La. Feb. 5, 1998) (FERPA violated when teacher sent newspaper a letter from a student's mother which expressed the mother's controversial views) *with Red & Black Publishing Co., Inc. v. Board of Regents,* 262 Ga. 848, 427 S.E.2d 257 (Ga. 1993) (records of students' violations of university policies not protected by FERPA). In the instant case, given the redaction of the complaint as to both her name and the class in which she was enrolled, this Court need not decide this issue.

The record before this Court does not support MCC's finding that Bonnell's actions constituted retaliation. For example, Bonnell explained that he passed out the redacted sexual harassment complaint to discuss in it his classes as he believed that the complainant had dropped his class, and he would not have done so if she were present in his class:

> Q .... If [the complainant] was [in class], you would have given [the complaint] to her, right?
> A. No.
> Q. Why not?
> A. Because I knew that it would include her. It would be her.
> Q. You knew that then she would know that the focus of the discussion was on her complaint, right?
> A. Yes. Part of the focus was on her complaint. The discussion on academic freedom was triggered by her document.
> Q. You didn't need a document to have an academic discussion?
> A. Sure. I used that context.
> Q. You are not giving it out if she happened to be in class is obviously related to the fact that she made the complaint?
> A. Yes.
> Q. And the focus of her was the discussion, and what she said, right?
> A. If she had been there, I would think it might have been retaliation, but there was none, and it didn't appear. I assumed she dropped, and it was closed as far as she was concerned.

(Transcript of Motion Hearing, Bonnell Testimony, August 3, 1999 at 84.) The facts appear to be that the complainant did not drop the class but instead stopped attending. (*Id.* at 86-87.) Nevertheless, Bonnell's testimony indicates that his conduct was not directed at the complainant.

The issue is whether the First Amendment protects the publication of Professor Bonnell's *Yes, Virginia* memorandum attached to a copy of the sexual harassment complaint filed against him that redacts the name of the complainant and her class. The Court holds that it does. Based on the content, form, and context of the distribution, Bonnell's speech relates to matters of a public concern, and was not done in retaliation for a complaint of sexual harassment.

Thus, the Court concludes that Bonnell has a significant likelihood of success on the merits of his claim that the MCC Defendants suspended him in violation of his rights under the First Amendment.

### C. Other Preliminary Injunction Factors

The third factor in evaluating a motion for preliminary injunction is the probability that granting the injunction will cause substantial harm to others. In the instant case, granting the injunction will not cause harm to the MCC Defendants. Failure to grant the injunction will cause significant harm to the Plaintiff who has already been suspended from teaching for seven months, and further harm to MCC students who wish to enroll in his classes. Indeed, Dr. Bellanca testified that "I realize that students think that he's an outstanding teacher, and I respect that ...." (Transcript of Motion Hearing, Bellanca Testimony, July 30, 1999 at 221).

Finally, the Court must examine whether the public interest is advanced by the issuance of the injunction. As this factor is similar to the *Pickering* balancing test, the Court relies on the analysis, *supra*, and determines that the First Amendment interests of Plaintiff and the public are advanced by the issuance of this injunction to reinstate Professor Bonnell at MCC.[19]

Based on an examination of the four factors relevant to the issuance of a preliminary injunction, the Court GRANTS Plaintiff's renewed motion for preliminary injunction.

## V. CONCLUSION

The Defendants assert that Plaintiff's publication of the redacted complaint and the *Yes, Virginia* response were likely to stifle potential student sexual harassment complaints by publically maligning and intimidating the instant complainant. On the other hand, the Defendants concede that they concluded early on that the instant complaint about classroom language was not a valid sexual harassment complaint. Indeed, the Defendants informed Bonnell of that finding on December 18, 1998. Defendant MacQueen stated, as the meeting with Bonnell broke up:

> I made the remark that this is not a sexual harassment case, as we do not view this as a sexual harassment case.

(Transcript of Motion Hearing, MacQueen Testimony, July 30, 1999 at 78.)

Further, as to the May 25, 1999 MCC investigative meeting with Professor Bonnell that his personal attorneys were permitted to attend, MacQueen testified:

> Well, we were concerned whether he had discussed his discipline with his stu-

---

**19.** The YALE UNIVERSITY, REPORT OF THE COMMITTEE ON FREEDOM OF EXPRESSION AT YALE (1975) noted:

> The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that the university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.
>
> We take a chance, as the First Amendment takes a chance, when we commit ourselves to the idea that the results of free expression are to the general benefit in the long run, however unpleasant they may appear at the time. The validity of such a belief cannot be demonstrated conclusively. It is a belief of recent historical development, even within universities, one embodied in American constitutional doctrine but not widely shared outside the academic world, and denied in theory and in practice by much of the world most of the time.
>
> Because few other institutions in our society have the same central function, few assign such high priority to freedom of expression. Few are expected to. Because no other kind of institution combines the discovery and dissemination of basic knowledge with teaching, none confronts quite the same problems as a university.
>
> (*Id.* at 5–6).
>
> Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.
>
> (*Id.* at 7.)
>
> If expression may be prevented, censored or punished, because of its content or because of the motives attributed to those who promote it, then it is no longer free. It will be subordinated to other values that we believe to be of lower priority in a university.
>
> The conclusions we draw, then, are these: even when some members of the university community fail to meet their social and ethical responsibilities, the paramount obligation of the university is to protect their right to free expression. This obligation can and should be enforced by appropriate formal sanctions. If the university's overriding commitment to free expression is to be sustained, secondary social and ethical responsibilities must be left to the informal processes of suasion, example, and argument.
>
> (*Id.* at 8-9.)

dents in the spring term, the spring 1999 term, and whether he had distributed the memorandum styled "Yes, Virginia" to the students or to the media. (Transcript of Motion Hearing, MacQueen Testimony, July 30, 1999 at 94.) Thus, MCC was concerned about two areas of conduct, both of which involved significant First Amendment considerations. First, Bonnell's speaking to his English students about his being suspended from teaching due to his use of the English language. Second, Bonnell's distribution of his *Yes, Virginia* memorandum discussing the "Sanity Clause," to wit, freedom of expression under the First Amendment, using, as context, a student letter challenging his expression, which had already been determined early on by MCC not to be a viable sexual harassment complaint.

. The justification set forth in the July 9 Bellanca memorandum in support of the four month suspension, was "Breach of Confidentiality and Retaliation" by his distribution of the student complaint, and his *Yes, Virginia* memorandum.

Professor Bonnell acted to depersonalize his actions and protect the student's confidentiality by removing the complainant's name and class from the copies he distributed. The MCC Defendants, with the student's consent, published her name.

It is important to note that the Defendants first used the student's complaint as a basis to discipline Plaintiff Bonnell, not for sexual harassment, but for his use of what the Defendants determined to be improper, non-germane classroom language. In other words, what the MCC Defendants now contend was a sexual harassment complaint, was determined by them to not be a valid sexual harassment complaint. Indeed, the MCC Defendants appear to have used that complaint as a basis for suspending Plaintiff for his classroom speech because they concluded that his speech was not protected by the First

Amendment. Professor Bonnell reacted to that February 1999 classroom speech suspension by responding directly to the complaint about speech and MCC's action to restrict his speech in the classroom. Yet, when Bonnell took that same complaint, which had been a basis for suspending him for his language, and used it for necessary context to respond on the issue of his First Amendment rights, the MCC Defendants reversed field and now contend that the issue was really sexual harassment after all, and that Bonnell's response was retaliation against the student complainant. The MCC Defendants' argument lacks coherence.

Since the basis for the MCC suspension in February was classroom language as attributed to that complaint, in order to respond to that complaint-based suspension, it was logical that Bonnell utilize the complaint for necessary context.

Some of the language utilized by Bonnell in his *Yes, Virginia* memorandum was harsh, and some of it was directed to specific allegations of the anonymous complainant. Yet, it was necessary to utilize the complaint for context and to respond to it.

The Court finds that the redaction of the name and class of the complainant, and generalized discussion in the *Yes, Virginia* memorandum of the use of the English Language, albeit much of it not of the King's English, resulted in a discussion of the First Amendment rights of an English professor. Both the beginning of Bonnell's memorandum, which speaks of the "Sanity Clause," *i.e.,* the First Amendment, and its conclusion which recites the First Amendment, clearly indicate that Professor Bonnell was discussing First Amendment issues. That the MCC Defendants, with the permission of the student complainant, chose to release her name is not a basis for terming Professor Bonnell's memorandum a specific retaliation against her.[20]

---

**20.** A DETROIT NEWS editorial, *Capsizing Academic Freedom,* June 21, 1999, at 6A, captured the significance of Professor Bonnell's complaint. Comparing Professor Bonnell's

Thus, while the MCC Defendants term the present four month suspension as being based upon a "Breach of Confidentiality and Retaliation," the facts presented to the Court do not support this finding. The redacted release of the complaint combined with the *Yes, Virginia* memorandum, given the facts behind the initial February suspension for language, and the MCC Defendants determination that this was not a valid sexual harassment complaint, do not sustain the suspension on this ground.

Finally, the Court notes that the MCC Defendants have already suspended Plaintiff Bonnell for seven months, thereby preventing him from teaching in the spring 1999 and summer 1999. The Court rejects the MCC Defendants' contention that this suspension was not a penalty because he received pay. The Court concludes that this suspension, which prevented him from pursuing his profession as an English teacher, has already imposed a significant penalty on him, and has deprived him of his First Amendment right to free speech in his classroom. Thus, even if the MCC Defendants could justify imposing on Bonnell a four month suspension from classroom teaching for breach of confidentiality and retaliation, that has already been served—Bonnell has been suspended from teaching for the last seven months.

Accordingly, the Court concludes that a preliminary injunction should be issued requiring that Professor Bonnell be reinstated immediately with pay to his teaching position at Macomb Community College.

SO ORDERED.

situation with that of a local canoeist, who after capsizing used profane language in the presence of women and children, the editorial pointed out:

> [A]nother free speech battle in the state was generally ignored, although its significance is far greater than the case of the potty—mouthed canoeist.
>
> John Bonnell, a popular and highly regarded English professor at Macomb Community College, was suspended four months ago for using pungent and graphic language during his classroom.
>
> This is part of Mr. Bonnell's teaching method. He claims it has been an effective way of reaching his students during his 32-year career and even cautions his classes at the start of each semester that they can expect to hear this sort of speech from him.
>
> Nonetheless, a student filed a complaint against him last January, and when Mr. Bonnell refused to alter his salty style he was suspended without pay. A lawsuit was filed, and the case is being argued in closed hearings at the college. Although Mr. Bonnell's case raises a serious issue of academic freedom, it does not have the media titillation factor of a soaked Mr. Boomer standing in the Rifle River and letting loose a stream of curses.
>
> Moreover, interference with free speech on campus has become an all-too-familiar story. College administrators, aquiver with sensitivity and keenly alert to lawsuits, repeatedly squelch speech or activity that conceivably may offend a government-certified and protected group.
>
> \*    \*    \*    \*    \*    \*
>
> Mr. Bonnell, however, was engaged in instruction in a clearly defined space and had advised those who might be offended to seek other options. Many of his students have picketed in his behalf. Hopefully, the college's administrators will also demonstrate the clarity of understanding shown by its students.